[L. A. No. 21480. In Bank. Aug. 25, 1950.]

C. MAYERS et al., Respondents, v. LOEW'S, INCORPORATED, Appellant.

Loeb & Loeb, Keating Coffey, Adrian A. Kragen and Herman F. Selvin for Appellants.

Mohr & Borstein and Alfred J. Borstein for Respondents.

TRAYNOR, J.—Plaintiffs brought this action to recover a bonus of one-half their regular daily wage allegedly due them for the period July 1, 1941 to August 30, 1942, under the terms of a collective bargaining agreement between Local 728, International Alliance of Theatrical Stage Employees and defendant motion picture studio. Defendant appeals from a judgment entered for plaintiffs.

Plaintiffs are members of Local 728. During the period for which compensation is sought they were employed by defendant on its night rigging crew. With minor exceptions not here material, their work shift began at 9 p.m. During the fall and winter of 1941 negotiations for a new collective bargaining agreement covering all the major studios in Hollywood, including defendant, were conducted between IATSE through its international representative and the business agents of the various Hollywood locals, and the studios through Fred Pelton as Producers' Labor Administrator and Pat Casey as chairman of the Motion Picture Producers'

Association. They resulted in a tentative agreement in January, 1942, providing for a general 10 per cent wage increase for employees in all classifications. That increase was paid by the studios during 1942. Paragraph 6 of the agreement also provided:

"6. *Shifts*—The Work Day shall be divided into four shifts of six hours each. First shift may start between six a.m. and eight a.m. Men called to start work two or more hours after the start of the third regular shift shall be considered as performing work on the fourth (graveyard) shift.

"The first three shifts shall be paid for at straight time; the fourth (graveyard) shift at straight time plus a bonus of ½ time."

Paragraph 53 of the agreement provided for the payment of wage increases retroactive to July 1, 1941.

The bonus specified in paragraph 6 was retroactively payable only to employees whose shifts began two or more hours after the starting time of the third shift. Since defendant's third shift began at 8 p.m., plaintiffs, who came to work at 9 p.m. during that period, were not "considered as performing work on the fourth (graveyard) shift," and consequently were not entitled to the bonus.

Following the circulation of the tentative agreement the parties continued negotiations for a final agreement. From time to time as modifications in the tentative agreement were agreed upon, they were announced in bulletins issued by the producers' representatives. During the negotiations the parties agreed to establish a standard starting time for the graveyard shift to replace the variable time dependent on the starting time of the third shift then provided by paragraph 6 of the tentative agreement. The new starting time was announced by a bulletin issued over Pelton's signature:

"August 24, 1942

"NOTICE TO ALL STUDIOS

Subject: Standard Starting Time of '*Graveyard Shift.*'

Re: Wage Scales and Working Conditions for the following I.A.T.S.E. Unions.

Q.—Local No. 80 — Grips
R.—Local No. 728 — Lamp Operators
T.—Local No. 44 — Property Craftsmen
V.—Local No. 727 — Laborers
X.—Local No. 165 — Projectionists
Y.—Local No. 695 — Sound Technicians

"Effective August 30, 1942, the first paragraph of Section 6 in the above references will be replaced and superseded by the following:

"6. *Shifts*—The Work Day shall be divided into four shifts of six hours each. First shift may start between six a.m. and eight a.m. Men called to start work at nine p.m. or later shall be considered as performing work on the fourth (graveyard) shift.

F. E. PELTON"

Workers reporting to work at 9 p.m. were thus newly classified as graveyard shift workers, and the effective date of the change was August 30, 1942. There was no reference to paragraph 53 providing that wage increases such as the graveyard shift bonus were to be paid retroactively to July 1, 1941.

The tentative agreement and the modifying bulletins were sent to the printer for the printing of the formal contract. The printed copies of the formal contract were delivered to the union in January 1943, and were signed by the business agents of the locals. They were thereupon delivered to Pelton's office for the approval and signature of the representatives of the studios. Paragraph 6 of the formal contract provided a 9 p.m. starting hour for the graveyard shift but did not provide an August 30, 1942 effective date as provided in the bulletin of August 24th. Paragraph 57 of the contract contained the same provision for retroactive payment of the wage increases as paragraph 53 of the tentative agreement.

Before the agreement was signed by the studio representatives or delivered to the union, Pelton dictated the following letter for signature by the business agents of the locals, including A. J. Moran, business agent of Local 728:

"Hollywood, California<br>February 1, 1943

Mr. Pat Casey, Chairman
Producers' Committee
5504 Hollywood Boulevard
Hollywood, California

Dear Mr. Casey:

Notwithstanding the provisions of Section 3 of the wage agreements dated February 15, 1942, between the various Motion Picture Producers whom you represent, and the undersigned, the effective dates of the 'working conditions' in such

wage agreements shall be subject to the following bulletins issued by your office:

| Date | Subject |
| --- | --- |
| May 22, 1942 | Meal Periods |
| Aug. 24, 1942 | Standard Starting Time of Graveyard Shift |
| Aug. 25, 1942 | Golden Hours |
| Aug. 27, 1942 | 'On Call' Employees Split Week between Studio and Distant Location |
| Aug. 28, 1942 | Distant Location Definitions and Working Conditions |

Yours very truly,
Studio Electrical Technicians
Local 728 of the I.A.T.S.E.
By A. J. MORAN              ''

The provisions of section 3 referred to in the letter are as follows:

''3. Wage scales, hours and working conditions for Local 728 shall be set forth in the 'Wage Scales and Working Conditions' attached hereto and shall be effective as of February 15, 1942, subject to the retroactive adjustments specified in said 'Wage Scales and Working Conditions.' ''

Sometime between February 5th and February 8th, 1943, Moran went to Pelton's office to get his union's copies of the formal contract and received them after signing certain copies of the contract and the letter set forth above.

Plaintiffs contend that they are entitled to retroactive compensation from July 1, 1941, for work performed on the 9 p.m. shift from that date under the terms of the formal contract. Defendant agrees that they are entitled to the bonus provided in paragraph 6 for all days worked after the August 30, 1942, effective date but contends that they are not entitled to the bonus for days worked beginning at 9 p.m. before that date for the reason that they were not ''considered as performing work on the fourth (graveyard) shift'' until 9 p.m. became the starting time of that shift on August 30th. In defendant's view, the formal agreement and the letter of February 1, 1943, incorporating the effective date of the August 24th bulletin therein must be read and construed together as a single integrated contract under Civil Code, section 1642*. It is urged that the contract and the letter

---

*''Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together.''

construed together provide for bonus payments to employees starting work at 9 p.m. or later after August 30, 1942, and that before that date the bonus payments are payable only to employees starting work two or more hours after the start of the regular third shift, in this case, at 10 p.m. or later.

The trial court refused to consider the letter or the bulletin of August 24th in its interpretation of the agreement because it concluded "that said letter and the bulletin to which it referred purported to change, contradict, modify, vary and alter the provisions of the formal collective bargaining agreement above mentioned with respect to retroactive pay," and that "said letter was not a part of the formal collective bargaining agreement but was extrinsic and collateral thereto." Relying solely on paragraphs 6 and 57 of the formal contract, the trial court ordered judgment for plaintiffs for bonus payments retroactively to July 1, 1941.

The conclusion of the trial court that the letter and the bulletin were not part of the formal contract is clearly contrary to the undisputed evidence before it. That evidence demonstrates conclusively that the formal contract and the letter of February 1st were executed and delivered at the same time. They related to the same subject matter, wages and working conditions of IATSE members employed by the studios. They were delivered at the same time with the express purpose of incorporating the effective dates of the specified bulletins into the provisions of the formal contract. "Where two or more written instruments are executed contemporaneously, with reference to the other, for the purpose of attaining a preconceived object, they must all be construed together, and effect given if possible to the purpose to be accomplished." (*People* v. *Ganahl Lumber Co.*, 10 Cal.2d 501, 507 [75 P.2d 1067]; *Symonds* v. *Sherman*, 219 Cal. 249, 253 [26 P.2d 293]; *Tuso* v. *Green*, 194 Cal. 574, 581 [229 P. 327]; *Burr* v. *Western States Life Ins. Co.*, 211 Cal. 568, 575 [296 P. 273]; *Shattuck* v. *Chase*, 86 Cal.App.2d 810, 813 [195 P.2d 475]; *Reid* v. *Johnson*, 85 Cal.App.2d 112, 115-116 [192 P.2d 106]; *Holbrook* v. *Fazio*, 84 Cal.App.2d 700, 701 [191 P.2d 123]; *Body-Steffner Co.* v. *Flotill Products*, 63 Cal.App.2d 555, 560 [147 P.2d 84]; *Lynch* v. *Bank of America*, 2 Cal.App.2d 214, 223 [37 P.2d 716]; *Basile* v. *California Packing Corp.*, 25 F.2d 576, 577; 1 Restatement, Contracts, § 235, pp. 319, 322-323.) Since the purpose of the agreements may be ascertained only by reference to each of the documents executed to accomplish that

purpose, it was error to exclude any of those documents from consideration.

The consideration of the letter of February 1st in the interpretation of the formal contract is not objectionable on the ground that it tends to vary, modify, or contradict the terms of that contract. Those terms are established by the contract and the letter and not by one to the exclusion of the other. By the express provision of the letter the contract must be read as if it specifically provided that the provisions of paragraph 6 with respect to the starting time of the graveyard shift became effective August 30, 1942. It must therefore be determined whether the parties meant that the payment of retroactive compensation based on paragraph 6 should be governed by the effective date thereof or by the earlier date of July 1, 1941, established by paragraph 57.

The trial court, on plaintiffs' objection, excluded evidence of the negotiations of the parties offered by defendant for the purpose of establishing the meaning that the union and the studios attributed to the effective date of the new starting time. Defendant contends that the excluded evidence would establish that the parties meant that the new starting time would be effective August 30th and that this date would govern the payment of retroactive compensation under the contract.

The agreements in the present case are ambiguous and internally inconsistent. Paragraph 57 of the formal contract provides for the retroactive payment of wage increases to July 1, 1941. Paragraph 6 as modified by the letter of February 1st provides that the graveyard shift shall start at 9 p.m. and that a bonus shall be paid to all employees starting work at that hour or later, but by its terms it is not effective until August 30, 1942. Is the payment of retroactive compensation to graveyard shift employees governed by paragraph 57 and thus payable to employees who were not considered as performing work on the graveyard shift at the time the work was performed? Or is the payment of retroactive compensation limited by the provision that the new starting time is effective August 30, 1942, so that before that date the graveyard bonus is payable only to persons considered as performing work on the graveyard shift at the time the work was performed, that is, those starting work two or more hours after the start of the third regular shift? Paragraph 3 of the formal contract provides that wage scales and working conditions therein provided are effective February 15, 1942, subject to the retroactive adjustments specified in paragraph 57. The

letter of February 1st provides that, "notwithstanding the provisions of Section 3," the effective date of the new starting time of the graveyard shift shall be August 30, 1942. Did the parties thereby intend to supplant only the effective date specified in paragraph 3, February 15, 1942, or did they intend to supplant the whole of paragraph 3, including the provision that wage scales and working conditions are "subject to the retroactive adjustments specified" in paragraph 57? The terms of the agreement furnish no clear answer to these questions. It is thus apparent that the contract is not clear on its face, and under the theory of the parol evidence rule that has been accepted by the majority of this court, evidence of the negotiations of the parties and of surrounding circumstances was admissible for the purpose of determining the meaning of the contractual provisions. (*Universal Sales Corp.* v. *California Press Mfg. Co.*, 20 Cal.2d 751, 761-762 [128 P.2d 665]; *California Canning Peach Growers* v. *Williams*, 11 Cal.2d 221, 228-229 [78 P.2d 1154]; *Merkeley* v. *Fisk*, 179 Cal. 748, 757 [178 P. 945]; see *Union Oil Co.* v. *Union Sugar Co.*, 31 Cal.2d 300, 306, 307 [188 P.2d 470]; *Body-Steffner Co.* v. *Flotill Products*, 63 Cal.App.2d 555, 561-562 [147 P.2d 84]; *Torrey* v. *Shea*, 29 Cal.App. 313, 316-317 [155 P. 820]; Code Civ. Proc., § 1860; Civ. Code, § 1647.) That evidence would have supported a construction of the contract favorable to defendant and it should have been considered by the trial court in its interpretation of the terms of the contract. Exclusion of that evidence was therefore prejudicial error.

The judgment is reversed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Schauer, J., and Spence, J., concurred.

Respondents' petition for a rehearing was denied September 21, 1950.